205 So.2d 662 (1968)
Aubrey V. MORTON, Appellant,
v.
STATE of Florida, Appellee.
No. 67-218.
District Court of Appeal of Florida. Second District.
January 12, 1968.
Rehearing Denied January 31, 1968.
Robert E. Jagger, Public Defender, and Carleton L. Weidemeyer, Asst. Public Defender, Clearwater, for appellant.
Earl Faircloth, Atty. Gen., Tallahassee, and William D. Roth, Asst. Atty. Gen., Lakeland, for appellee.
PIERCE, Judge.
This is an appeal by Aubrey V. Morton, defendant in the Court below, from a judgment and sentence entered against him pursuant to a jury verdict finding him guilty of stealing an automobile.
*663 Defendant was informed against in the Pinellas County Circuit Court for larceny of a 1955 Plymouth automobile, the property of Barbara A. Armstrong. Upon trial before jury, he was found guilty of the charge contained in the information, and he appeals to this Court from a judgment and sentence entered by the Court pursuant to the verdict. Two contentions are made here for reversal: (1) the State failed to prove sufficiently the nonconsent of the car owner to the taking of the vehicle by defendant, and (2) the Court should have declared a mistrial when, on cross-examination, after defendant had admitted being previously convicted of a felony, he was asked the further question, "How many times?" We consider these two questions in inverse order.

(1) The question as to plurality of convictions.

After the State had rested its case, defendant took the witness stand and after finishing his direct testimony, the cross-examination began as follows:
"BY MR. ALLWEISS (Asst. State Atty.):
Q Mr. Morton, have you ever been convicted of a felony?
A I have, sir.
Q How many times?
MR. FURNELL (Asst. Public Defender):
I object, Your Honor. I would like to approach the bench.
* * * * * *
THE COURT: The objection to the second question is sustained. I don't think it was answered. The jury is instructed to disregard the second question."
Thereafter the Court denied a motion for mistrial based upon the foregoing. It will be observed that objection was sustained to the question "How many times?" Defendant contends that the asking of the question was prejudicial and that the Court should not only have disallowed the answer but also have granted a mistrial. There is no merit in such contention.
F.S. Sec. 90.08 F.S.A. reads as follows:
"90.08 Witnesses; conviction of other crimes as disqualification
No person shall be disqualified to testify as a witness in any court of this state by reason of conviction of any crime except perjury, but his testimony shall be received in evidence under the rules, as any other testimony; provided, however, evidence of such conviction may be given to affect the credibility of the said witness, and that such conviction may be proved by questioning the proposed witness, or, if he deny it, by producing a record of his conviction. Testimony of the general reputation of said witness may likewise be given in evidence to affect his credibility." (Emphasis supplied).
It will be noted that in the body of Sec. 90.08 the word "crime" is in the singular while in the title it reads "crimes" in the plural. In several cases the Florida Supreme Court, and also the 5th U.S. Court of Appeals, have held, in construing said section, that it contemplates prior convictions in the plural sense. Mead v. State, Fla. 1956, 86 So.2d 773; Lockwood v. State, Fla.App. 1958, 107 So.2d 770; Collins v. State, 1944, 155 Fla. 141, 19 So.2d 718; Williams v. United States, 5 C.A.Fla. 1931, 46 F.2d 731, and Whalen v. United States, 5 C.A.Fla. 1966, 367 F.2d 468.
We quote briefly from these cases, beginning with Mead (text 86 So.2d 774):
"* * * [O]nce the appellant became a witness he could be examined the same as any other witness about matters that would illuminate the quality of his testimony, and in the process he could be properly asked about former convictions of `crime.' Sec. 90.08, Florida Statutes 1953, and F.S.A. Evidence of conviction of other crimes might affect the credit *664 the jury would give his story, Martin v. State, 86 Fla. 616, 98 So. 827, cited in Watts v. State, 160 Fla. 268, 34 So.2d 429." (Emphasis supplied)
In Collins (text 19 So.2d 719):
"The fourth and fifth questions challenge the propriety of the cross-examination of defendant by the State's Attorney (when the defendant was testifying on the trial as a witness in his own behalf) as to former convictions of defendant. From careful consideration of the record, we do not find that the course pursued by the State's Attorney offends against the enunciations by us in the case of Washington v. State, 86 Fla. 519, 98 So. 603, or in Martin v. State, 86 Fla. 616, 98 So. 827. In the case before us the State's Attorney did not seek to have the witness state the facts or circumstances of any offense of which he had been convicted; neither did he attempt to show that defendant had been convicted of any offense involving personal violence. The examination sought to elicit information as to the number of times, if any, the witness has been convicted. The defendant requested no charge by the trial court in regard to the effect, if any, to be given such evidence and, therefore, cannot be heard to complain that no special charge was given as to this."
In Williams (text 46 F.2d 732):
"It is elementary that, when a defendant takes the stand, he may be asked any question that would tend to impeach him the same as any other witness, and he may be interrogated as to previous convictions. It was proper to interrogate these defendants as to their own previous convictions. * * *" (Emphasis supplied).
And in Whalen (text 367 F.2d 470):
"The court did not commit error when it asked the defendant if he had been convicted of more than one felony after the defendant had admitted that he had been convicted of one felony. The law is settled in this circuit that for purposes of impeachment evidence of prior convictions may be introduced against a defendant who takes the witness stand. The rule of impeachment by prior conviction is not limited to the mention of only one conviction or of simply `prior conviction'. See, for example, Kemp v. Government of Canal Zone, 5 Cir.1948, 167 F.2d 938, 940 (two felonies); Russell v. United States, 5 Cir. 1945, 146 F.2d 129 (`previous convictions of crime'); Matthews v. United States, 5 Cir.1945, 145 F.2d 823 (`other felonies')." (Emphasis supplied).
Lockwood was a case decided by this 2nd District Court, and the opinion by Judge Allen first quotes the record as follows:
"Defendant was charged with robbery, and during the trial, on cross-examination of defendant, the following occurred:
`Q. Have you ever been convicted of a crime in a Criminal Court of Records? A. Yes.
`Q. How many times? A. Once.
`Mr. Morton: I object.
`Q. (By Mr. Sandstrom) How many times? A. Once.
`Q. When was that?
`Mr. Morton: I object. It is irrelevant and immaterial. It is an improper question.
`The Court: Objection denied.'"
It will be observed that the question: "How many times?" was the same identical question as is strenuously urged here, only in Lockwood it was asked not once but twice; also there the objection was overruled and the question answered, while here the objection was sustained and the jury instructed to disregard the question. On the question raised, this Court in Lockwood said (text 107 So.2d 772):
"In Mead v. State, supra, and cases therein cited, we find a rather clear-cut *665 procedure to be followed by the State in cases such as the one we now have before us. When the defendant testifies on his own behalf, he may be asked whether he has ever been convicted of a crime. If he admits such conviction, assuming for the moment there was only one, the matter must stop at that point. If he denies such conviction, the State may, on rebuttal, put the record of the conviction into evidence and show that defendant is the person named in such record.
"We emphasized, in the above generalization, that our imaginary defendant had been convicted of only one prior crime. In the present case, defendant had apparently been convicted three times prior to the charge here involved. However, a careful review of Florida decisions, though not revealing a case directly on point, indicates that a prosecutor may, after getting defendant to admit at least one prior conviction, ask how many times defendant has been convicted. Watts v. State, 1948, 160 Fla. 268, 34 So.2d 429; Collins v. State, 1944, 155 Fla. 141, 19 So.2d 718." (Emphasis supplied).
Other States uniformly adhere to the same rule. In 98 C.J.S. Witnesses § 507 c, page 411, is the following:
"While the impeaching evidence is restricted to the fact of conviction, and cannot show details and incidents of the crime, it may show the name and nature of the crime, and the number of convictions. It is immaterial where the conviction was obtained, provided the crime is a sufficient one, under the law of the forum, for impeachment purposes." (Emphasis supplied).
And again, on the same page in the text:
"It may be shown that the witness has been convicted of crime several times."
Supporting the foregoing text are cases cited from the District of Columbia, Kentucky, Oregon, Arizona, California, Utah, and the Federal Court of Appeals in Nebraska. No conflicting authority is cited.
There is no merit in the contention made here.

(2) Lack of evidence as to non-consent of owner.

The point here urged is that the State failed to sufficiently prove that the owner of the vehicle in question did not consent to the taking. This involves a brief excursion into the facts adduced at the trial.
During the evening of December 2-3, 1966, one Donald E. Armstrong was "bar hopping" in St. Petersburg in a 1955 Plymouth automobile just purchased for his wife, Barbara A. Armstrong, from one Thomas of Thomas Motors in Clearwater. Upon leaving the last bar, known as the Executive Lounge, he noticed his new Plymouth missing from where he had parked it in front. He immediately reported it to the police but never saw the car again until December 8th, when it was returned to him by the St. Petersburg Police Department at Campbell's Wrecker Service. It was apparently in the same general condition it was previously except for a flat tire and about a week's wear and tear. Neither Mrs. Armstrong nor Mr. Thomas testified, but the original bill of sale to Mrs. Armstrong was produced and put in evidence. Armstrong testified that neither he nor his wife gave consent for the car to be taken.
Patrolman McWade of the St. Petersburg Police Department testified that on December 8, 1966, at about 2:15 A.M., while on duty cruising north on 34th Street, he observed a Plymouth automobile which matched the description of the Armstrong car reported missing; that he followed the car till it pulled in to a Shell Gas Station at 30th Avenue; that he pulled in behind the Plymouth, checked with headquarters by radio and ascertained that the tag number was the same as was on the stolen car, then placed the driver, defendant Aubrey V. Morton, under arrest. In further checking he found the identification number on the chrome plate inside the *666 driver's door to correspond with the Armstrong car. He took Morton to the police station where, after the usual "no threats, no promises, full explanation of rights", etc. procedures, Morton stated he had bought the car "from a person named Thomas Jackson who lived in a fishing camp" but could give no location of the camp nor produce any papers concerning the purchase.
Two statements by Morton were in evidence, one purportedly made to the officers at the jail, and the other when he voluntarily took the witness stand at trial. The jail statement was given to the jury by policeman Robert C. Young, as follows:
"I advised him that he was charged with auto theft, and what would you like to tell me about it. He stated I might as well tell you I took the car. I don't recall where I took it from, as I was drunk. The first thing I remember is I was somewhere near Lake City, Florida, driving north. I figured I had gone this far that I might as well go the rest of the way to Georgia. I drove to Douglas, Georgia. I stayed there for two or three days. I met a friend of mine there, a Colonel Washington Corbett * * * And we stayed in Douglas and did some drinking and had some fun and came back to Florida, as I was going to get Colonel Corbett a job with my boss. But when I got back to Florida I had lost my job. I couldn't get him a job either. So we decided to go back to Douglas. That is where we were going when the officer stopped us * * *. I asked him if he had told Officer McWade that he took the car. He stated no, I told him that I bought the car."
As his own witness, Morton testified that on the night of December 2nd, after getting off work, he visited several bars with friends where he had drinks; that the next thing he knew "is when I came to in this automobile * * *. I don't know if it was Lake City or not * * *. I was to the side of the road and I woke up in the back seat of the car * * *. I came to and went to another tavern and got something to drink". He stated he then drove to Douglas, Georgia, to see his "grandmother", after which, in company with a drinking companion Corbett, he drove back down to St. Petersburg and was arrested as before narrated. Asked why he came back he said "Well, I came back because of the car * * *. I didn't know what the score was other than I wanted to come back to St. Petersburg and leave the car. I didn't know what to do with it * * *. I wanted to leave it where the ownership could be found of it, sir * * *. I planned to just park it and let the police just pick it up or someone."
Morton did not fare too well on cross-examination. He admitted he "could have" turned the car over to some police department but he "didn't know" why he failed to do so; that he kept riding around in the car over Florida and Georgia for four days until he returned to St. Petersburg at noon or shortly before that on December 7th. He admitted he lied to the police officer when first arrested at the Shell Station but that it was "because I didn't know anything else to say * * * that was the first thing that entered my mind".
In the light of the record, the contention that insufficient evidence was adduced to prove non-consent of the owner is untenable. Bowles v. State, Fla. 1943, 153 Fla. 219, 14 So.2d 269, is authority that the ingredient of non-consent may be established by circumstantial evidence, where it is shown that the owner was not present at the time of the asportation and the testimony is such as to exclude every reasonable presumption that the owner consented. A mere cursory consideration of the evidence is sufficient to dispel any theory that either Mr. or Mrs. Armstrong or Mr. Thomas consented to have Morton steal the car. He does not even deny that he took it, but lamely observed that "I didn't know whether I had borrowed the car or what".
*667 The case of Albritton v. State, 1921, 81 Fla. 684, 88 So. 623, strongly relied upon by Morton, is inapplicable to the case here. In Albritton the theft was of a cow which was jointly owned by six different persons and was only one of a number of range cattle belonging to the owners. Only three of the six owners testified and it also appeared that the stock of cattle was not in the exclusive custody or control of any one of the owners. Here it is undisputed that the Plymouth car was in possession and custody of Mr. Armstrong with full authority of his wife, who was the new owner. So much for the non-consent of the owner.
Initially, in consideration of this case we were concerned as to whether the evidence was sufficient to prove the higher offense of larceny of the automobile, as denounced by F.S. Sec. 811.021 F.S.A., or merely the misdemeanor charged in F.S. Sec. 811.21 F.S.A. of wilfully taking or using any vehicle of another without right or authority. There are some elements in the case that would have made appropriate a conviction under the latter charge, such as the fact that the license tag had not been removed from the vehicle, that its color had not been changed, that no attempt had been made to alter the serial or identification numbers, and the fact that he did finally come back to St. Petersburg.
But the record likewise contains ample evidence to support the charge of larceny of the automobile, which is a felony. Sometime, somewhere, somehow, between December 3rd and December 8th he could have turned the car in to someone with legal authority either in Florida or Georgia, or have contacted somebody, somewhere, and informed them of having a car in his possession that did not belong to him. When he woke up in the car, according to his own testimony, instead of returning to South Florida or notifying the police, he drove right on further north into Georgia, where he visited relatives. And when he did get back to St. Petersburg he was driving around for over fourteen hours before he was apprehended in the car after 2 o'clock in the morning. And the first thing he did, he lied about his possession of the vehicle.
So in further examination of the record we conclude that the evidence of intent to steal and convert the car to his own use was sufficient to support the greater charge, if the jury believed it, which apparently it did.
The judgment of conviction is affirmed.
LILES, C.J., and SHANNON, J., concur.